

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00029-CV

WESLEY HENSON                                                          APPELLANT

V.

ALLEN REDDIN                                                           APPELLEE

----------

## FROM THE COUNTY COURT AT LAW OF WISE COUNTY

----------

## OPINION

----------

### I. INTRODUCTION

We address two issues in this appeal: whether the evidence is legally and factually sufficient to establish that Appellant Wesley Henson converted parts belonging to Appellee Allen Reddin and whether Reddin's evidence of conversion damages is legally and factually sufficient to support the trial court's judgment awarding Reddin $4,561.52 in damages. Because the evidence is legally and factually sufficient to establish a conversion and because the

evidence of damages is legally and factually sufficient to support the trial court's judgment, we will affirm.

## II. Factual and Procedural Background

### A. Overview

The dispute between Henson and Reddin centered on a polyurethane machine used to spray truck bed liners, insulation, "or whatever you want to spray with it."[1] The polyurethane machine was permanently mounted inside an enclosed gooseneck trailer that had "Discount Industrial Coating, Incorporated"[2] emblazoned on it.[3] The polyurethane machine had not been used for a while, so it had become clogged and was not in working order. Henson owned a one-half interest in Discount Industrial Coating, Inc.; Joseph Brophy owned the other one-half interest.

Henson decided that he wanted to sell his one-half interest in the company, and Reddin let Henson know that he was interested in purchasing the

---

[1]The polyurethane machine had heat pumps to make the liquid come through the hoses and spray onto barns or bed liners. Reddin said that there were two sides with a mix at the end of the "gun."

[2]We note that the reporter's record refers to the company as "Discount Industrial Coatings, Incorporated" while the pleadings refer to "Discount Industrial Coating, Incorporated." For consistency, we use the party name shown in the pleadings.

[3]We note that the record contains references to a trailer and a rig, as well as to a machine, a gun, and a compressor. Because some of these terms appear to be used interchangeably, it is not always clear from the testimony what the parties are referring to.

polyurethane machine if he could get it in working order. Reddin purchased parts and began working on the polyurethane machine in an attempt to get it in working order. After Reddin had purchased parts and had added them to the polyurethane machine, Henson moved the trailer in which the polyurethane machine was located. Henson did not return any parts to Reddin and did not disclose the location of the polyurethane machine.

## B. Reddin's Testimony

Regarding the parts that were added to the polyurethane machine, Reddin testified that he had paid $2,690.28 for a fusion gun and a transfer pump; $1,800 for one kit of foam;[4] $57.66 for a set of hoses; and $13.68 for a "Y strainer iron body 20 mesh." Reddin provided receipts for the amounts that he had spent on the parts, and the receipts were admitted into evidence without objection. Reddin and Brophy attached the parts to the polyurethane machine on a Friday, but they were not able to get the polyurethane machine in working order that day.

According to Reddin, on the same day that he added the parts to the polyurethane machine, he talked to Henson about the price of the polyurethane machine. Henson asked $10,000 for the polyurethane machine, and Reddin offered $5,000. Reddin said that Henson indicated he "was going to think about it." During this conversation, Reddin told Henson that the parts were on the trailer. By Monday, the trailer was gone.

---

[4]The receipt shows $18,000 for ten kits of foam, but Reddin testified that only one was added to the polyurethane machine.

Reddin testified that he called Henson several times indicating that he needed to get the parts back from the trailer, but Henson did not return his calls. Reddin was able to talk to Henson one time about getting the parts back, but Henson told him that "he wasn't bringing nothing back."

After four to six weeks had passed, Reddin saw the trailer in Newark and called Brophy. They went and retrieved the trailer, but police stopped them and told them to take it back. They returned the trailer to the place where they had found it. Reddin testified that the plan in retrieving the trailer was for him to remove parts and for Brophy to keep the trailer and work out the issue with Henson.

Reddin thereafter sued Henson for conversion and sought to recoup the damages that he had sustained when the parts that he had installed on the polyurethane machine were ruined.[5]

## C. Brophy's Testimony

Brophy was familiar with the polyurethane machine that Reddin was interested in acquiring, and Brophy knew that the machine was not working because a substance had crystallized in the machine. Brophy told Reddin that

---

[5]Reddin explained that the parts that he had added to the polyurethane machine were ruined because the resin he had attempted to run through the lines in the polyurethane machine had sat in the pump and had crystallized when he was denied access to the machine. Reddin testified that it is not normal practice to clean the lines on the polyurethane machine every day and that the machine could have been cleaned out up to a week later without any harm to the parts that he had installed.

4

he would need to bring parts to test the machine and to see if it could be restored to working order. Reddin purchased the parts, and they were installed on the machine, but Brophy testified that he and Reddin were not able to get the machine to work. Brophy and Reddin finished working on the machine one Friday evening, and when they came back on the following Monday, the trailer was gone.

Brophy said that the trailer was later discovered at Henson's in-laws' house in Newark, that he did not know how the trailer got there, and that he did not contact Henson about it. Brophy hooked up the trailer and attempted to bring it back to where it had previously been located because he owned a one-half interest in the trailer and equipment.

When Brophy was about a half a mile down the road with the trailer, he was pulled over by a Rhome Police Officer, who told him to take the trailer back and to settle the issue in court. Brophy asked Henson why

> he was trying to have me thrown in jail for stealing something that I owned half of. And what he was doing. And why he was doing it. And he said this is a matter that has to be solved in Court, and I'll see you in Court. And you won't get anything until we go to Court.

Brophy also told Henson during the above conversation that Reddin's parts were on the rig.

### D. Henson's Testimony

Henson testified that he knew that Reddin was working on the machine to see if he could get it in working order to purchase it. Reddin had to bring his own

5

parts in order to make repairs on the machine. Henson, however, testified that he did not authorize Reddin to make any repairs.

Henson testified that he and Reddin never reached a deal for the sale of the machine or for Henson's interest in Discount Industrial Coating. Henson testified that he never told Reddin that he would "think about his offer." Instead, he told Reddin that he should buy a polyurethane machine that Henson had seen online for $4,500. From Henson's standpoint, he had already declined Reddin's offer, so Reddin was no longer purchasing the machine.

Henson testified that the trailer in which the machine was mounted was his property, not the property of Discount Industrial Coating. Henson said he got the trailer on January 13, 2007, and took it to his father-in-law's home because he was trying to sell the machine to a business owned by his father-in-law.

Henson received a call from Brophy on January 15, 2007, telling him that Reddin had some property in the trailer; Henson testified that Brophy's call was the first time that Henson was informed that Reddin had property on the trailer. Henson told Brophy, "Just tell Allen to call me, and he can get his stuff off." Henson said Reddin never contacted him and did not return his phone calls. Henson later clarified that he had in fact received a phone call from Reddin while he was on the phone with Brophy. Henson said he returned Reddin's call and left a message that Reddin could call and come get the parts, but Reddin never called him.

6

The next day, on January 16, 2007, Henson received a call that the trailer was being stolen, and the police were called. The trailer was returned to Henson's in-laws' property. After Brophy returned the trailer, Henson moved the trailer to a new location.

Upon cross-examination, Henson testified that he was aware as of January 15, 2007, that Reddin's property was on the rig. Henson was also aware that Reddin was running resin and polycarbonate through the hoses to get the machine to work. Henson initially testified that he was not aware that if Reddin did not get his parts off the rig that the resin would eventually set up, crystallize, and cause the parts to become useless. Henson later testified that he knew that if Reddin was not able to recover the parts that he had added to the machine, they would become worthless; that was why Henson told Reddin to come and get his "stuff."

### E. The Lawsuit

Reddin sued Henson in the justice court asserting a conversion claim and a money had and received claim. Henson failed to appear, and Reddin obtained a default judgment for $4,457—the amount he paid for the parts, plus court costs—against Henson. Henson appealed the judgment to the county court at law, arguing that Discount Industrial Coating, Inc. should be added to the suit. Reddin added Discount Industrial Coating as a defendant, and Henson and Discount Industrial Coating moved for summary judgment on Reddin's conversion claim and on his money had and received claim. The county court at

7

law denied summary judgment on the conversion claim but granted summary judgment on the money had and received claim. The conversion claim was tried to the court.

After hearing the testimony from Reddin, Henson, and Brophy, the county court at law signed a judgment for Reddin in the amount of $5,419.46— $4,561.52 in damages plus $857.94 in prejudgment interest. The trial court made the following findings of fact:

1. On or about December 2006, Defendant Wesley Henson became interested in selling either his share of Defendant Discount Industrial Coating, Inc., or a machine that was an asset of that corporation.

2. On or about December 2006, Plaintiff became interested in purchasing either the business interest or the machine.

3. The machine was not in working order.

4. On or about December 2006 and January 2007, Plaintiff purchased certain items of equipment and tools for the purpose of repairing the machine and estimating its value.

5. The items and tools included a kit of foam, a transfer pump, a fusion gun, and assorted hoses, hereinafter called the "property."

6. Plaintiff purchased the property on the open market from retailers for the amount of $4,561.52.

7. The value of such items in Wise County, Texas, at that time was $4,561.52.

8. At the time of the events described below, Plaintiff Allen Reddin was the owner of the property.

9. In early January, 2007, Defendant Henson took a trailer containing the property and held it away from Plaintiff, which had the effect of destroying the property for its intended use.

10. By January 15, 2007, Defendant Henson unlawfully assumed and exercised control over the property to the exclusion of Plaintiff Reddin's rights as an owner.

11. Defendant Henson refused to return the property to Plaintiff Reddin after Plaintiff Reddin demanded the return of the property from Defendant Henson personally and through Defendant Henson's business associate.

12. Plaintiff Reddin originally filed suit in this cause on March 13, 2007.

The trial court also made the following conclusions of law:

1. Defendant Wesley Henson individually converted the property belonging to Plaintiff Allen Reddin.

2. Defendant Henson is individually liable to Plaintiff Reddin for actual damages in the amount of $4,561.52, and for prejudgment interest in the amount of $857.94.

3. The indebtedness of Defendant Henson to Plaintiff Reddin bears interest at the rate of 5.00% from December 16, 2010 until paid.

Henson perfected this appeal.

### III. STANDARDS OF REVIEW

Findings of fact entered in a case tried to the court have the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence supporting a jury's answer. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994).

9

## A. Legal Sufficiency Standard

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960).  In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not.  *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

## B. Factual Sufficiency Standard

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and

a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

## IV. SUFFICIENCY ANALYSES

## A. Claim for Conversion

In his first issue, Henson argues that the evidence is legally and factually insufficient to establish that he converted any property belonging to Reddin; Henson argues that the evidence is legally and factually insufficient to establish that he knew at the time he removed the trailer that he was taking Reddin's property.

Conversion is the unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another to the exclusion of, or inconsistent with, the owner's rights. *Khorshid, Inc. v. Christian*, 257 S.W.3d 748, 758–59 (Tex. App.—Dallas 2008, no pet.) (citing *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex. 1971)). To establish a claim for conversion of personal property, a plaintiff must prove that (1) he owned or had legal possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property. *Id.* at 759 (citing *Smith v. Maximum Racing, Inc.*, 136 S.W.3d 337, 341 (Tex. App.—Austin 2004, no pet.)). Acting

with good faith or innocence is not a defense to conversion. *Id.* (citing *Maximum Racing, Inc.*, 136 S.W.3d at 343).

Here, as set forth above, the trial court found that Reddin had "purchased certain items of equipment and tools for the purpose of repairing the machine and estimating its value"; that Henson had taken "a trailer containing the property and [had] held it away from [Reddin], which had the effect of destroying the property for its intended use"; that "Henson unlawfully [had] assumed and [had] exercised control over the property to the exclusion of Plaintiff Reddin's rights as an owner"; and that "Defendant Henson [had] refused to return the property to Plaintiff Reddin after Plaintiff Reddin [had] demanded the return of the property from Defendant Henson personally and through Defendant Henson's business associate." The record supports these findings.[6]

The testimony at trial established that Reddin was attempting to get the polyurethane machine in working order, that Reddin had purchased parts for the machine, that Reddin had installed the parts on the machine, and that Henson thereafter moved the trailer in which the machine was mounted. Reddin testified that he had called Henson numerous times, attempting to retrieve the parts, but Henson did not answer; the one time that Henson answered, he refused

---

[6]We note at the outset that Henson's ownership of the trailer and one-half interest in the machine fails to authorize Henson's conversion of the parts Reddin added to the machine. *See Burns v. Rochon*, 190 S.W.3d 263, 266–70 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (lessor's right to lockout holdover tenant failed to authorize conversion of lessee's leased equipment).

Reddin's request. Viewing the evidence favorable to the trial court's findings, as we must, and disregarding the evidence to the contrary because a reasonable factfinder could do so based on a credibility determination, the evidence is legally sufficient to support the trial court's findings supporting each element of conversion of Reddin's property by Henson. *See Burns*, 190 S.W.3d at 270 (holding evidence legally sufficient to support conversion judgment); *Automek, Inc. v. Orandy*, 105 S.W.3d 60, 63 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (holding evidence legally and factually sufficient to support conversion judgment against one defendant); *see also Cargal v. Cargal*, 750 S.W.2d 382, 384 (Tex. App.—Fort Worth 1988, no writ) (holding evidence legally sufficient to support conversion judgment).

In considering the factual sufficiency of the evidence to support the trial court's findings, we consider Henson's testimony that is contrary to the findings. Henson testified that he did not know until after he moved the trailer that Reddin had parts on it. But even if Henson did not know about Reddin's parts until after the trailer was moved, his innocence is no defense to conversion. *See Khorshid, Inc.*, 257 S.W.3d at 759; *Am. Petrofina, Inc. v. PPG Indus., Inc.*, 679 S.W.2d 740, 759 (Tex. App.—Fort Worth 1984, writ dism'd) (holding that neither complete innocence nor perfect good faith are defenses to an action for conversion); *Chrysler Credit Corp. v. Malone*, 502 S.W.2d 910, 914–15 (Tex. Civ. App.—Fort Worth 1973, no writ); *White-Sellie's Jewelry Co. v. Goodyear Tire & Rubber Co.*, 477 S.W.2d 658, 662 (Tex. Civ. App.—Houston [14th Dist.] 1972, no writ)

13

(same). Additionally, although the record contains conflicting testimony regarding Henson's refusal to return Reddin's parts to him—Henson claimed he offered to let Reddin call and come get the parts, while Reddin testified that Henson would not return his calls and refused to permit him to come get the parts—the trial court is the sole judge of the credibility of the witnesses and is to resolve any inconsistencies in their testimony. *See Burns*, 190 S.W.3d at 269–70 (recognizing trial court could reject conversion-judgment defendant's version of events, including that he had offered to return property). Considering and weighing all of the evidence in the record pertinent to that finding, including that Henson's delay in authorizing the retrieval of the property that had the effect of destroying the parts, the credible evidence supporting the finding is not so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *See id.* at 270 (holding evidence factually sufficient to prove that defendant refused plaintiff's request for return of the equipment); *Automek, Inc.*, 105 S.W.3d at 63 (holding evidence factually sufficient to support conversion because plaintiff made demand and defendant refused). We overrule Henson's first issue challenging the legal and factual sufficiency of the evidence to show that a conversion took place.

## B. Damages

In his second issue, Henson argues that the evidence is legally and factually insufficient to support the judgment's damage award. Henson contends that the only evidence in the record concerning damages consisted of Reddin's

receipts for the property. Henson argues that while this evidence establishes the purchase price of the property, it wholly fails to establish the fair market value of the property, which Henson contends is the sole measure of damages for conversion.

Generally, the measure of damages in a conversion case is the fair market value of the property converted at the time of the conversion, with legal interest. *United Mobile Networks, L.P. v. Deaton*, 939 S.W.2d 146, 147–48 (Tex. 1997). Fair market value has been defined as the price that the property would bring when it is offered for sale by one who desires, but is not obliged to sell, and is bought by one who is under no necessity of buying it. *Burns*, 190 S.W.3d at 270. A property owner may testify about the market value of his property if his testimony shows that he is familiar with the market value and his opinion is based on that market value. *Khorshid*, 257 S.W.3d at 760.

However, when converted property has no readily ascertainable fair market value, the measure of damages is the actual value of the property to the owner at the time of its loss. *Burns*, 190 S.W.3d at 270 (citing *Crisp v. Sec. Nat'l Ins. Co.*, 369 S.W.2d 326, 328–29 (Tex. 1963)). In such circumstances, the purchase price is probative of actual value. *See id.* The original cost in the market and the manner and time and place of its use, the appearance before and after the alleged injury, and the relative usefulness and physical condition may be offered into evidence to establish conversion damages. *Wutke v. Yolton*, 71 S.W.2d 549, 552 (Tex. Civ. App.—Beaumont 1934, writ ref'd).

15

For example, the Beaumont court in *Wutke* examined what type of evidence was admissible to determine actual value for secondhand furniture because no standard of market value existed. *Id.* The appellate court explained that the trial court

> did not err in receiving evidence as to what appellees paid for the furniture "several years before the date of the conversion." This testimony was admissible on the issue of actual value. . . . "When goods of this character are destroyed, a proper method of arriving at their value at the time of loss is to take into consideration the cost of the articles, the extent of their use, whether worn or out of date, their condition at the time, etc., and for them to determine what they were fairly worth. The cost alone would not be the correct criterion for the present value, but it would be difficult to estimate the value of such goods, except by reference to the former price in connection with wear, depreciation, change of style, and present condition.

*Id.*

Testimony and evidence regarding purchase price, however, standing alone, is not factually sufficient to support a fair-market-value damages award or an actual-value damages award. *See Lee v. Dykes*, 312 S.W.3d 191, 199 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (stating that "it is not axiomatic that a plaintiff can sell property for the same amount at which he purchased it"). When converted property has no readily ascertainable fair market value, the measure of damages is the actual value of the property to the owner at the time of its loss and evidence of purchase price constitutes a starting point for determining actual damages. *See Wutke*, 71 S.W.2d at 552. From that starting point, amounts are subtracted for wear and tear, depreciation, etc. *See id.*

16

Here, Reddin offered receipts for the parts into evidence and testified as to the purchase price of the parts that he had installed on the polyurethane machine. The receipts document that all of the parts were purchased within two to three weeks of the date they were installed on the polyurethane machine. The receipts indicate that M&M Insulation purchased the parts; Reddin testified that M&M Insulation was Brophy's company and that he, Reddin, had actually paid for the parts. Reddin said that he purchased them through Brophy's company because "I get my stuff cheaper through his account. I didn't have an account with companies that he's got." Reddin also testified that the parts were worthless after the conversion because they had been ruined by the resin crystallizing in the polyurethane machine. The evidence conclusively establishes that the new parts were installed on the polyurethane machine on a Friday and that Henson moved the trailer with the machine mounted in it either one or two days after the new parts were installed; when Reddin and Brophy returned to work on the machine on Monday, it was gone.

Considering the evidence favorable to the trial court's finding that Reddin purchased the parts for $4,561.52 and its finding that the value of the parts in Wise County, Texas, at the time was $4,561.52, legally sufficient evidence exists to support these findings. Reddin testified to the purchase price of the parts and provided receipts documenting the prices; the parts were purchased within a few weeks of the date they were installed on the polyurethane machine and were on the machine only one or two days before they were converted. This evidence is

legally sufficient to support the trial court's award of $4,561.52 in damages to Reddin under either an actual value or a fair market value measure of damages. *See Redman Homes, Inc. v. Ivy*, 920 S.W.2d 664, 669 (Tex. 1996) (holding evidence legally sufficient to allow jury to assess damages when property owner gave dollar figures regarding price he would place on personal items lost in mobile home fire); *Burns*, 190 S.W.3d at 271 (holding evidence legally sufficient to sustain assessment of damages based on testimony of purchase price paid for bar equipment). We therefore overrule the portion of Henson's second issue challenging the legal sufficiency of the evidence to support the damages award.

This evidence is likewise factually sufficient to support the trial court's award of $4,561.52 in damages to Reddin under either an actual value or fair market value measure of damages. As mentioned above, the evidence established the price Reddin paid for the parts just a few weeks before he installed them on the machine, meaning there was little time for depreciation of the parts. *Compare Lee*, 312 S.W.3d at 199 (holding plaintiff's testimony of purchase price of diamond ring one and one-half years before conversion did not establish fair market value of ring in absence of evidence of appreciation or depreciation since purchase), *with Wutke*, 71 S.W.2d at 552 (recognizing depreciation is one factor in establishing actual value). The evidence established that Reddin was able to purchase the parts at a lower price by purchasing them through Brophy's company's account, meaning there was little risk that Reddin had overpaid for the parts and was seeking recovery of more than what the parts

18

were actually worth. *Compare Lee*, 312 S.W.3d at 199. The evidence established that the machine was converted one or two days after the installation of the new parts, meaning that the parts had experienced little wear and tear prior to their conversion. *See Wutke*, 71 S.W.2d at 552 (recognizing purchase price minus wear, depreciation, change of style, and present condition can establish actual value). Thus, here, evidence of purchase price existed, evidence of no or only a few weeks' of depreciation existed, evidence of the fairness or lowness of the purchase price existed, and evidence of no or very little wear and tear on the parts existed. No controverting evidence probative of fair market value or of actual value was introduced into evidence. After considering and weighing all of the evidence in the record pertinent to the trial court's $4,561.52 damages finding, the credible evidence supporting the finding is not so weak that the answer should be set aside and a new trial ordered, and the finding is not contrary to the overwhelming weight of all the evidence because no controverting evidence probative of actual value or of fair market value was introduced into evidence. We overrule the portion of Henson's second issue challenging the factual sufficiency of the evidence to support the damages award.

## V. CONCLUSION

Having overruled both of Henson's issues, we affirm the trial court's judgment.

SUE WALKER
JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and WALKER, JJ.

DELIVERED:  January 5, 2012