**Reverse and Render; Affirmed and Opinion Filed June 30, 2014**



**In The**

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-11-01697-CV

## CURTIS B. WISE, Appellant

### V.

## SR DALLAS, LLC, Appellee/Cross Appellant

### V.

## JERRY SPENCER, LP, Cross Appellee

**On Appeal from the 191st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-07-03956-J**

## OPINION

Before Justices FitzGerald, Fillmore, and Evans
Opinion by Justice FitzGerald

This dispute arises out of the purchase of an adult entertainment club. Curtis Wise ("Wise"), appellant, complains of a jury verdict in favor of SR Dallas, LLC ("SR") finding him liable for breach of contract and fraud. In a cross-appeal, SR complains of the judgment awarding conversion damages to intervener/cross-appellee Jerry Spencer, LP ("Spencer"). We reverse and render judgment that Spencer take nothing on his conversion claim, but in all other respects affirm the trial court's judgment.

**BACKGROUND**

*Factual Background*

Brad Keiller is an individual who invests in adult entertainment clubs all over the world. He resides in Dallas and was interested in acquiring a club in the Dallas market. His criteria for a club included the ability to operate, a long-term lease, a sexually oriented business ("SOB") license, and a liquor license. Keiller was informed that a Dallas club operating under the name "Texas Show Girls" ("TG") might be available for purchase, so he met with the owner Curtis Wise, principal and sole member of WiseTime Entertainment, LLC ("WiseTime"), to discuss a potential sale.

Keiller met with Wise in early 2005. Keiller wanted to structure the transaction as a stock purchase rather than an asset purchase because a stock purchase would allow him to immediately begin operating under the previous owner's licenses. Wise told Keiller that there was a valid lease on the premises that allowed him to operate until 2013, and that he was confident he would be able to obtain extensions to operate until 2023. Wise told Keiller that WiseTime held a sublease on the premises through Roma Corp., another subleasee. Wise also said that there was a valid liquor license, and there was only one small issue with the Texas Alcoholic Beverage Commission ("TABC") that might require the payment of a small fine to resolve.

Wise further represented that there was a current, valid SOB license, but there were a couple of problems with the license. The first problem involved a nuisance suit that required the club to be shut down for a period of forty-five days. But this was deemed a non-issue because the probation period for closure would be completed by October 8, and the sale transaction was not set to close until mid-October. The second issue involved litigation with the City of Dallas in connection with the violation of an ordinance concerning the proximity of one SOB to another. The violation resulted when Wise added a fifteen foot addition to the club that placed it within

the prohibited distance from another SOB. Wise informed Keiller that WiseTime and the City of Dallas were involved in settlement negotiations, and as a worst case scenario, seven feet would need to be removed from the west end of the building.

To facilitate the purchase, Keiller set up two companies. The first company, Dallas Composite Club Venture, was organized to be the company that took over the running of the business and operated as TG. The second company, SR, was organized to hold the leases and licenses.

On October 15, 2005, Wise, WiseTime, and SR executed a purchase and sale agreement (the "Agreement"). The Agreement was structured as a stock purchase agreement, and provided for the sale of WiseTime and TG, together with all rights to the leased premises and related assets for a purchase price of $2.3 million. The Agreement identified the amount of debt owed by WiseTime as of the date of the Agreement. Among the identified debts, there is a representation that WiseTime owed a $440,000 debt to Jerry Spencer, LP ("Spencer") and that such debt was "secured by a security agreement and a UCC-1."[1]

The Agreement included representations and warranties made by Wise. These representations and warranties included a representation that the lease was in good standing and that WiseTime was in good title and possession of a valid non-contested lease, and that the lease provided options for extension through May 18, 2013. WiseTime further represented and warranted that it had all "proper and current permitting, licensing, and grants by all applicable and required governmental agencies without exception."

The Agreement also provided that SR could rely on Wise's representations and warranties without conducting its own due diligence. To this end, the Agreement stated:

---

[1] The Agreement identified $300,000 owed by WiseTime under three assignment agreements, which were referenced as exhibits to the Agreement. Then, the Agreement included a representation that, at the time of closing, WiseTime owed a maximum additional amount of $600,000. $440,000 of this $600,000 was identified as a debt owed to Spencer and up to an additional $160,000 in debts were to be identified on or before closing.

> The Seller shall make no claim against the Buyer regarding Buyer's review or non-review of the Exhibits or lack of Buyer's investigation of the Seller's exhibits, warranties, representations and guarantees and the Seller agrees that Buyer may rely solely on the warranties, representations, and guarantees made herein by the Seller without exception as being true, correct, and complete.

The Agreement was amended ten days after its execution.[2] The representations and warranties from the original Agreement, however, remained unchanged.

Following the execution of the amended Agreement, Wise settled the litigation with the City of Dallas and WiseTime entered into an agreed final judgment. Pursuant to the terms of the judgment, WiseTime was required to comply with the ordinance by May 31, 2006 in order to keep the SOB license for the premises. This compliance entailed removal of fourteen feet of the fifteen foot addition to the building. Wise did not consult with the landlord about removal of the addition, and signed the agreed judgment.

Keiller later learned that the landlord did not consent to the removal of the addition on the property. In fact, the landlord had never consented to construction of the addition in the first place. As a result, a SOB could not be operated on the premises.

Keiller also discovered that Wise failed to disclose the full extent of the enforcement action with the TABC. Rather than the "single" administrative action Wise had described, there were several violations on different dates that had simply been combined in one action. The TABC would not allow SR to apply for or operate under a new liquor license on the premises unless SR agreed to the immediate termination of the existing WiseTime liquor license.

SR also learned that the lease on the premises had been terminated prior to the signing of the Agreement. Consequently, the lease was not in good standing, and SR did not have the right to extend the lease through 2013.

---

[2] The amendment pertains primarily to modification of payment terms not relevant here. It also gives the parties time to attempt to resolve the litigation with the City concerning the nuisance and the west wall.

SR made payments to Wise under the Agreement until April 2007. From January 2006 through March 2007, SR also made fifteen payments to Spencer on the $440,000 debt described in the Agreement. These payments totaled approximately $181,765.95. But when SR could not verify that Spencer had actually loaned money to WiseTime or that a debt existed, SR ceased making payments to Spencer.

*Procedural Background*

SR initiated the underlying lawsuit against Wise and asserted claims for breach of contract, fraud and negligent misrepresentation. Wise answered and counterclaimed for breach of contract. Spencer filed a plea in intervention and asserted claims against SR for breach of contract and conversion. Spencer's breach of contract claim was predicated on the theory that he was an intended third-party beneficiary of the Agreement. Spencer claimed that pursuant to the Agreement, SR assumed a $440,000 debt owed to him and breached the contract by failing to make payments on the allegedly assumed debt. Spencer further claimed that the debt was secured by the furniture, fixtures, and inventory ("FFE") of the business, and SR converted his property when Keiller removed all of the FFE from the business premises.

The case was tried to a jury. SR moved for a directed verdict on Spencer's claims against it. The trial court granted the directed verdict as to Spencer's third-party beneficiary breach of contract claims against SR, but submitted Spencer's conversion claim to the jury. The jury found that Wise breached his contract with SR and committed fraud and negligent misrepresentation. The jury awarded SR contract damages in the amount of $806,706.41, fraud damages in the amount of $704,480.45, attorney's fees in the amount of $295,311.41, and found that SR was excused from its failure to comply with the Agreement. The jury also found that SR converted property owned by Spencer and awarded Spencer damages to be recovered from SR in the amount of $258,234.05. SR moved for the entry of judgment on its claims and for judgment

notwithstanding the verdict on Spencer's claims against it. Wise also moved for judgment notwithstanding the verdict.

The trial court denied all motions for judgment notwithstanding the verdict, granted SR's motion for judgment, and signed a final judgment on September 27, 2011. The judgment recites that SR shall recover from Wise $704,480.45 in damages for fraud, together with pre- and post-judgment interest, and that Spencer shall recover from SR $258,234.05 in damages for conversion, together with pre- and post-judgment interest. The judgment further recites that Wise take nothing on his claims against SR. There is no award of contract damages or attorney's fees against Wise on SR's breach of contract claim.[3] On October 19, 2011, Wise moved for a new trial and challenged the court's denial of his motion for a directed verdict, and the jury findings against him on breach of contract, negligent misrepresentation, fraud, and SR's excused nonperformance. The trial court entered an order denying Wise's motion for new trial on December 7, 2011.

## ANALYSIS

In three issues, Wise asserts the trial court erred in denying his motion for new trial because: (a) the evidence is legally and factually insufficient to support the jury's findings that he breached the contract and that SR's performance was excused; (b) there is no evidence or insufficient evidence to support the jury's finding that he committed fraud, and (c) there is no evidence or insufficient evidence to support the damage award of $704,480.45. In two cross-appeal issues, SR challenges the legal and factual sufficiency of the evidence to support the jury's findings that SR converted Spencer's property and that the fair market value of the converted property is $258,234.05.

---

[3] None of the parties complain that the judgment erroneously omitted the contract damages and attorney's fees. In a motion for new trial, Wise asserts that "SR waived its contract action in open court." SR did not address this contention in its response to the motion. Comparing the verdict to the judgment, it appears that SR elected to recover its fraud damages rather than its breach of contract damages. There is, however, nothing in the record to confirm or explain such an election.

As we previously noted, the final judgment does not include the jury's breach of contract findings with regard to SR's breach of contract claim against Wise. Generally, Texas appellate courts have jurisdiction over final judgments, and such interlocutory orders as the legislature deems appealable by statute. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.012 (West Supp. 2012); *Bison Bldg. Materials, Ltd. v. Aldridge*, 422 S.W.3d 582, 585 (Tex. 2012). Because the breach of contract claim was not included in the final judgment, Wise's complaint about the breach of contract finding is immaterial, and we restrict our inquiry to Wise's complaints about fraud and SR's excused performance, and to SR's complaints about Spencer's award for conversion.

### Fraud

In his second issue, Wise contends the evidence was legally and factually insufficient to support the jury finding that he engaged in fraud. When a party challenges the legal sufficiency of the evidence to support an adverse finding on which he did not have the burden of proof at trial, the party must demonstrate that there is no evidence to support the adverse finding. *Thornton v. Dobbs*, 355 S.W.3d 312, 315 (Tex. App.—Dallas 2011, no pet.). In our review, we must credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Metroplex Mailing Services, LLC v. RR Donnelley & Sons, Co.*, 410 S.W.3d 889, 895 (Tex. App.—Dallas 2013, no pet.). If more than a scintilla of evidence supports the finding, the legal sufficiency challenge fails. *Cont'l Coffee Prods., Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996); *Sharifi v. Steen Auto., LLC*, 370 S.W.3d 126, 147 (Tex. App.—Dallas 2012, no pet.).

In a factual sufficiency review, appellate courts must examine the evidence that both supports and contradicts the jury's verdict in a neutral light. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam). We still defer to the jury's implicit determinations of

credibility and weight to be given to the evidence. *See Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761 (Tex. 2003). Therefore, when a party brings a factual sufficiency challenge to a jury finding for which the party did not have the burden of proof, we consider and weigh all of the evidence and set aside the verdict only if the evidence that supports the finding is so weak as to make the verdict clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Pitts & Collard, L.L.P. v. Schechter*, 369 S.W.3d 301, 312 (Tex. App.—Houston [14th Dist.] 2011, no pet.).

The jury was asked to determine whether Wise committed fraud by failing to disclose and/or intentionally misrepresenting material facts in the Agreement. To establish that Wise engaged in fraud by affirmative misrepresentation, SR was required to prove (1) that a material representation was made, (2) the representation was false, (3) when the representation was made, Wise knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion, (4) Wise made the representation with the intent that SR should act on it, (5) SR acted in reliance on the representation, and (6) SR suffered injury. *See Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009) (per curiam); *Fath v. CSFB 1999–C1 Rockhaven Place Ltd. P'ship*, 303 S.W.3d 1, 5 (Tex. App.—Dallas 2009, pet. denied). Fraud by nondisclosure is a subcategory of fraud. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997). The elements of fraud by nondisclosure require (1) a deliberate failure to disclose material facts, (2) by one who had a duty to disclose such facts, (3) to another who was ignorant of the facts and did not have an equal opportunity to discover them, (4) with the intent the listener act or refrain from acting, and (5) the listener relies on the nondisclosure resulting in injury. *7979 Airport Garage*, *L.L.C. v. Dollar Rent A Car Sys., Inc.*, 245 S.W.3d 488, 507 n. 27 (Tex. App.—Houston [14th Dist.] 2007, pet. denied); *see also Bradford v. Vento*, 48 S.W.3d 749, 754-55 (Tex. 2001).

It is undisputed that the Agreement provided that SR could rely on Wise's representations and warranties as true without conducting its own due diligence. The evidence at trial focused on whether the representations and warranties Wise made in the Agreement prior to the sale were true, and whether there were additional material facts that Wise failed to disclose.

Among the representations Wise made in the Agreement was the representation that the lease was in good standing and not in actual or contingent default. Wise also represented that he had good title and possession with regard to the lease. Subsequent to the execution of the Agreement, however, SR learned that the lease had been terminated prior to the signing of the Agreement. Plaintiff's Exhibit 5, a copy of the notice of termination, was admitted into evidence. The notice, dated October 12, 2005, directed to Roma Corp., shows WiseTime as receiving a copy. The notice states that the sublease is terminated and directs that Roma Corp. shall vacate the property. The defaults cited pursuant to the sublease include using the property as a "common nuisance" and allowing a judgment to be attached to the property.

Wise testified that he signed the Agreement on October 12, 2005 and received the notice of termination on October 13. SR did not sign the Agreement until October 15, 2005. When asked if he informed Keiller that the lease had been terminated before Keiller signed the Agreement on behalf of SR, Wise claimed that the reason the Agreement was amended was to give SR some time to attempt to work out the issues with the lease. But when confronted with the amendment to the Agreement, Wise admitted that the document makes no reference to the lease. Wise also testified that after October 12, SR was the party dealing with the lease problem. Nonetheless, a letter in Wise's files dated October 24 suggests a meeting between WiseTime and the landlord to attempt to resolve the lease issue. Although he denied that he was attempting to resolve the issue before Keiller discovered that the lease had been terminated, our factual

sufficiency review requires deference to the jury's determinations of credibility and the weight afforded the evidence. *See Golden Eagle*, 116 S.W.3d at 761.

Keiller testified that he reviewed the lease after the Agreement was signed, and he disagreed with Wise's interpretation that WiseTime had an absolute right to renew the lease. Consequently, in late October or early November 2005, Keiller contacted Roma Corp., the sublessor, for clarification. Roma informed Keiller that it would not extend the terms of the lease, and that the lease had been terminated by the landlord.

Wise also represented that WiseTime had a "single TABC administrative action against it." After the execution of the Agreement, SR learned that the "single" action actually consisted of twelve violations that had been consolidated in a single action that was going to result in termination of the WiseTime liquor license. Keiller testified that the violations consisted of charges for underage drinking, prostitution, lewd conduct, and drug use which occurred on different dates. According to Keiller, Wise did not disclose any of these violations before the Agreement was signed. Keiller described how he learned that the club had a long history of violations, and explained that with the TABC, every violation builds on another. This results in the fines becoming increasingly larger and ultimately results in cancellation of the liquor license. The TABC made clear to Keiller that the pending administrative matter could not be resolved merely by paying a fine; the liquor license was going to be cancelled. Keiller testified that the TG liquor license was cancelled, and SR never did obtain a liquor license for the premises.

Wise also represented that WiseTime had a valid SOB license. But in order to retain the license, Wise was required to remove the fifteen foot addition from the building. Keiller testified that he learned Wise had not obtained approval from the landlord to construct the addition and removal of the addition was not allowed. If the fifteen feet could not be removed from the building, there would be no SOB license, and the club would be out of business. From this

evidence, the jury may have reasonably inferred that Wise made affirmative misrepresentations or failed to disclose material facts to SR.

Keiller testified that SR relied on the representations Wise made in determining whether to purchase the business. The purchase price of the business was $2.3 million dollars, and Keiller paid over $1 million dollars toward this purchase. Keiller valued the business he actually received at $230,000.

Viewing the evidence in the light favorable to the jury's finding, crediting favorable evidence if a reasonable fact–finder could and disregarding contrary evidence unless a reasonable fact–finder could not, we conclude that there is some evidence supporting each element of the jury's finding of fraud. Thus, we conclude that SR presented legally sufficient evidence that Wise made misrepresentations and failed to disclose material facts in connection with the Agreement, with the intent that SR rely on these misrepresentations and omissions, and that SR relied on these misrepresentations and omissions to its detriment. Furthermore, after considering and weighing all of the evidence in a neutral light, we conclude that the finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. We overrule Wise's challenge to the legal and factual sufficiency of the evidence supporting the finding of fraud.

*Damages*

Having concluded the evidence was sufficient to support the jury's finding of fraud, we next examine whether the evidence was legally and factually insufficient to support the jury finding that SR suffered $704,480.45 in damages as a result of Wise's fraud. Wise does not explain the basis for his argument concerning the sufficiency of the evidence. Instead, he simply argues that the "actual damage testimony as it relates to the agreement . . . shows there is insufficient evidence to support [the damage award]." Then, Wise supplies three excerpts from

testimony, one of which pertains to Keiller's job duties as an associate attorney many years ago, one of which shows the date the Agreement was signed, and the last demonstrating that the $2.3 million dollar purchase price was to be paid in installments. The lack of discussion of this issue is insufficient to raise an issue for our review. *See* TEX. R. APP. P. 38.1(i) (requiring a brief to contain a "clear and concise argument for the contentions made"); *Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284 (Tex. 1994) (noting appellate courts have discretion to deem issues waived due to inadequate briefing).

Moreover, even if we considered Wise's briefing adequate to merit review, the evidence is sufficient to support the jury's determination on damages. In considering damages for fraud and negligent misrepresentation, the jury was instructed to consider "the difference, if any, between the value of the business as it was received and the value SR paid for it."[4] The evidence shows that SR made payments under the Agreement in the following amounts: $509,014.66 to Wise, $294,500 to certain assignees, $181,765.95 to Spencer, and $75,208 to vendors. Keiller also testified that SR was forced to pay Roma Corp. $102,225.96 to obtain a release from the sublease. These payments combined totaled over $1,162,000. Keller testified that the value of the business received was $230,000. The jury has the discretion to award damages within the range of evidence presented at trial, so long as a rational basis exists for the jury's calculation. *Duggan v. Marshall*, 7 S.W.3d 888, 893 (Tex. App.—Houston [1st Dist.] 1999, no pet.); *Mayberry v. Tex. Dep't of Agric.*, 948 S.W.2d 312, 317 (Tex. App.—Austin 1997, writ denied). From the evidence presented, we conclude there is more than a scintilla of evidence to support the finding that Wise's fraud proximately caused SR to suffer damages in the amount of $704,480.45.

---

[4] The jury was asked separate questions concerning fraud (Question 2) and negligent misrepresentation (Question 3), and made affirmative findings as to each. Then, the jury was asked to determine what amount of money, if any, would compensate SR for the damages proximately caused by the conduct in response to Question 2 or Question 3.

Moreover, the award is not clearly wrong or manifestly unjust. The first part of Wise's third issue is overruled.

### Excused Performance

The jury found that SR failed to comply with the Agreement, but found the failure was excused because of Wise's prior failure to comply with a material obligation of the Agreement. The judgment recites that Wise take nothing on his claims against SR. In the second part of his third issue, Wise complains that the evidence is legally and factually insufficient to support the jury's finding of excused performance. We disagree.

A party is released from further obligation under a contract if the other party has materially breached the contract. *See Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 198 (Tex. 2004). The evidence showed that SR made payments to Wise under the Agreement until April 2007. From January 2006 through March 2007, SR also made payments on the $440,000 debt described in the Agreement. As previously discussed, Wise was obligated to provide valid liquor and SOB licenses and a valid, renewable lease on the premises, and failed to do so. This evidence is sufficient to support the jury's conclusion that Wise breached the contract and by reason of such breach, SR's further performance was excused. The second part of Wise's third issue is overruled.

### Conversion

In two cross-points, SR argues the evidence is legally and factually insufficient to support the jury's findings that SR converted Spencer's property and that the fair market value of the property converted was $258,234.05.

Conversion is the "unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights." *Waisath v. Lack's Stores, Inc*., 474 S.W.2d 444, 447 (Tex. 1971); *Tex. Integrated*

*Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc*., 300 S.W.3d 348, 376 (Tex. App.—Dallas 2009, pet. denied) (op. on reh'g). To establish conversion of personal property, a plaintiff must prove (1) the plaintiff owned, had legal possession of, or was entitled to possession of the property; (2) the defendant, unlawfully and without authorization, assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with, the plaintiff's rights; (3) the plaintiff made a demand for the property; and (4) the defendant refused to return the property. *Wells Fargo Bank Northwest, N.A. v. RPK Capital XVI, L.L.C.*, 360 S.W.3d 691, 699 (Tex. App.—Dallas 2012, no pet.).

Spencer testified that $258,234.05 was the amount due and owing on the $440,000 loan. The jury awarded Spencer this amount as damages for conversion. On original submission, Spencer argued the evidence establishes that $258,234.05 is the fair market value of the converted property because it represented the balance due on the note, and Spencer and Wise both testified that the original loan was to pay for remodeling of the property. In supplemental briefing, Spencer argues that the actual value of the FFE is the appropriate measure of damages, and the $258,234.05 awarded by the jury reflects the actual value of the FFE. We are not persuaded by either argument.

Generally, the measure of damages for conversion is the fair market value of the property at the time and place of the conversion. *United Mobile Networks, L.P. v. Deaton,* 939 S.W.2d 146, 146–48 (Tex. 1997). Fair market value has been defined as the price that the property would bring when it is offered for sale by one who desires, but is not obligated to sell, and is bought by one who is under no necessity of buying it. *Burns v. Rochon*, 190 S.W.3d 263, 270 (Tex. App.—Houston [1st Dist.] 2006, no pet.). However, when converted property has no readily ascertainable fair market value, the measure of damages is the actual value of the property to the owner at the time of its loss. *Id.* In such circumstances, the purchase price is probative of actual

value. *See id.* To establish conversion damages, the original cost in the market, and the manner, time, and place of use, the condition of the property and the relative usefulness before and after the alleged injury may be offered into evidence. *Henson v. Reddin*, 358 S.W.3d 428,436 (Tex. App.—Fort Worth 2012, no pet.). But testimony regarding purchase price, standing alone, will not support a fair-market value damages award. *See Lee v. Dykes*, 312 S.W.3d 191, 199 (Tex. App.—Houston [14th Dist.] 2010, no pet.). Such evidence is but a starting point for actual damages. *See Wutke v. Yolton*, 71 S.W.2d 549, 552 (Tex. Civ. App.—Beaumont 1934, writ ref'd n.r.e.). From that starting point, adjustments are made for wear and tear, depreciation, and other pertinent factors. *See id.*

Here, there is no evidence to support the fair market value of the property *at the time of the conversion.* Indeed, there is no testimony specifically identifying when the FFE was allegedly converted. Keiller testified that he received furniture, fixtures, and equipment from Wise, and that this FFE consisted of lighting, glassware, tables, chairs and "that sort of thing." Although Keiller valued the FFE that he received at around $30,000, the testimony is vague and describes only the value of "what he received" when he took possession of the property on December 1, 2005. Keiller did not testify as to the value at the time he stopped making payments to Spencer under the Agreement in March 2007, which is presumably when the conversion is alleged to have occurred. Keiller further testified that he removed some of the FFE from the premises to use in another club. There is nothing to indicate the specific items that were removed or remained, or the value of these items at any point in time.

There is also no evidence of the purchase price of the FFE. Wise testified that he borrowed money from Spencer for remodeling in 2002. A promissory note from Wise in favor of Spencer, dated February 13, 2003, was admitted into evidence. The note provided for funding of "up to $225,000" with monthly interest payments beginning March 15, 2003. The outstanding

principal balance as of July 15, 2003 was to be amortized for a period of sixty months, with payments of principal and interest commencing on August 15, 2003 and continuing through July 15, 2008. The note states that a security interest is granted in "all furniture, fixtures, and equipment" located on the premises. Although Spencer asserts that a UCC financing statement was filed in connection with the alleged security interest, the financing statement offered at trial was not admitted into evidence.

But Wise did not identify any specific items of furniture, fixtures, and equipment that may have been purchased during the remodeling. *See Hughes Blanton, Inc. v. Shannon*, 581 S.W.2d 538, 540 (Tex. Civ. App.—Dallas 1979, no writ) (concluding evidence not competent to establish fair market value of converted tools where no evidence of particular tools or which tools were converted). If such purchases were made, there was no testimony concerning the purchase price of any specific items. Instead, Wise's testimony was only that the $440,000 amount represented debt for "furniture and fixtures," and he and Keiller discussed this amount in conjunction with the identification of the outstanding WiseTime debts. Spencer then testified that of the $440,000 debt, $258,234.05 remained due and owing.

Spencer asserts that the evidence supports the judgment because the value of the FFE was negotiated in an arms-length transaction. We disagree. The amount of the debt may have been negotiated, but the amount of the debt is not evidence of the fair market value of the property that allegedly secures the debt. Even if we were to assume that the purchase price of the FFE was the $440,000 debt under the Agreement, there is no evidence concerning the depreciation, wear and tear of the items, the condition of the property, and the manner, time place and use of the property.

In his supplemental briefing, Spencer advances an alternative theory of valuation. Specifically, Spencer contends the evidence is sufficient to establish actual value. In this regard,

Spencer notes that an actual value measure of damages is frequently used in lieu of the fair market value measure to determine the value of restaurant and bar furniture and equipment, as well as other property with no readily ascertainable value. We do not disagree with this general proposition. *See, e.g., Ogden v. Wilson*, 649 S.W.2d 780, 783 (Tex. App.—Austin 1983, writ ref'd n.r.e.). Actual value refers to the actual value to the owner of the property at the time of loss. *See id.* This case, however, was submitted to the jury without objection on a fair market value theory of valuation, not an actual value theory.[5] Even if we were inclined to entertain a damages model that was not presented to the jury, there is no evidence that the damages awarded represent the actual value of the property. Spencer testified as to the amount due under the note; there was no testimony concerning the value of the FFE to Spencer or Keiller at the time of the loss. Instead, it appears that the jury took the original amount of the debt ($440,000), subtracted the payments SR made ($181,765.95), and awarded the amount remaining on the contract ($258,234.05). This contract measure of damages, standing alone, is not an appropriate remedy for conversion. Damages for conversion are limited to the amount necessary to compensate the plaintiff for actual losses sustained as a natural and proximate result of the defendant's conversion. *Alan Reuber Chevrolet, Inc. v. Grady Chevrolet, Ltd.*, 287 S.W.3d 877, 889 (Tex. App. —Dallas 2009, no pet.). In the present case, the evidence is legally insufficient to support the damages awarded by the jury for conversion.

There is also no evidence that SR refused to return the property after a proper demand by Spencer. *See Wells Fargo Bank*, 360 S.W.3d at 699. Spencer does not dispute the lack of demand, arguing that demand would have been useless or was not required. *See Autry v. Dearman*, 933 S.W.2d 182, 191–92 (Tex. App.—Houston [14th Dist.] 1996, writ denied); *First*

---

[5] The jury was asked, "What is the fair market value of the property converted by SR Dallas at the time of the conversion? Answer in dollars and cents, if any."

*State Bank, N.A., v. Morse*, 227 S.W.3d 820, 827–28 (Tex. App.—Amarillo 2007, no pet.);

*McVea v. Verkins*, 587 S.W.2d 526, 531 (Tex. Civ. App.—Corpus Christi 1979, no writ).

The elements of conversion that were submitted to the jury, however, included the requirement that "Spencer demanded return of the property and SR refused return of the property." There was no pleading, argument at trial, jury issue, or proof to support Spencer's current assertion that demand would have been futile or was otherwise not required.

On the record before us, we conclude the evidence is legally insufficient to support the jury's finding on conversion. Accordingly, we reverse and render judgment that Spencer take nothing on his conversion claim. In all other respects the trial court's judgment is affirmed.

111697F.P05

/Kerry P. FitzGerald/
KERRY P. FITZGERALD
JUSTICE



# Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

CURTIS B. WISE, Appellant

No. 05-11-01697-CV      V.

SR DALLAS, LLC, Appellee/Cross Appellant

V.

Jerry Spencer, LP, Cross Appellee

On Appeal from the 191st Judicial District Court, Dallas County, Texas
Trial Court Cause No. DC-07-03956-J.
Opinion delivered by Justice FitzGerald.
Justices Fillmore and Evans participating.

In accordance with this Court's opinion of this date, the judgment of the trial court as to conversion is **REVERSED** and judgment is **RENDERED** that Cross-Appellee Jerry Spencer take nothing on his claim. In all other respects, the judgment of the trial court is **AFFIRMED.**

It is **ORDERED** that appellee SR DALLAS, LLC recover its costs of this appeal from appellant CURTIS B. WISE.

Judgment entered June 30, 2014